Argued and submitted May 11, affirmed July 7, petition for review denied
October 6, 2016 (360 Or 422)

In the Matter of L. T. M.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. M. S.,
*Appellant.*

Benton County Circuit Court
15JU04397; A160831

379 P3d 844

Megan L. Jacquot argued the cause and filed the brief for appellant.

Nani Apo, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

## ORTEGA, P. J.

In this dependency case, the juvenile court asserted jurisdiction over mother's child, L, after concluding that, because of mother's mental illness, L's circumstances created a "current threat of serious loss or injury" that would likely be realized without the court's intervention. ORS 419B.100(1)(c).[1] Mother appeals that judgment, contending that DHS did not establish, by a preponderance of the evidence, that L's circumstances posed a "current threat" at the time of the jurisdictional hearing. We conclude that the evidence, including mother's history of mental illness, which involved periods of stability followed by declines serious enough to result in extended hospitalizations, was legally sufficient to permit the juvenile court to determine that L's circumstances presented a current threat of serious loss or injury. Accordingly, we affirm the juvenile court's judgment.

We decline to exercise our discretion to exercise *de novo* review, which neither party has requested in any event. Accordingly, "we draw the historical facts from the juvenile court's explicit factual findings" and "supplement those facts contained in the trial court's explicit findings with additional facts drawn from the record that are either uncontested or consistent with the juvenile court's ultimate disposition." *Dept. of Human Services v. M.A.H.*, 272 Or App 75, 77-78, 354 P3d 738 (2015); *see also Dept. of Human Services v. N.P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013) (setting out the standard of review for a court's jurisdictional determination).

Mother, who was 24 years old at the time of the jurisdictional hearing, has a history of severe mental illness. Although the exact timeline of her illness is unclear, it appears that mother has suffered from schizophrenia or related conditions since she was 17 years old, resulting in multiple hospitalizations over the years.

In November 2010, mother was diagnosed with bipolar disorder and hospitalized in Wyoming for a period

---

[1] Under ORS 419B.100(1)(c), the "juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age" and "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others."

of eight months. During that hospitalization, mother gave birth to her first child, with whom she never bonded and did not want to have a relationship. Her parental rights to that child were eventually terminated by a court in that state. The record of the jurisdictional hearing contains little information regarding the circumstances of that prior termination proceeding.

In February 2012, a police officer in Wyoming found mother pacing the streets and took her to a state hospital for an evaluation. She was diagnosed with paranoid schizophrenia and remained hospitalized for four to six months. After being discharged from the state hospital, mother moved to Florida.

Mother testified that, while in Florida, she continued to take the medications previously prescribed to her by her doctor at the state hospital, which were helping her meet her daily needs. Nevertheless, as occurred in Wyoming, police in Florida found mother lost on the streets and took her to the state hospital for an evaluation, which resulted in a two-month hospitalization. Upon her discharge, mother returned to Wyoming.

Sometime in 2013, mother was hospitalized once more; however, the record is unclear about the date and length of that hospitalization and whether that hospitalization took place in Wyoming or Utah. Mother testified that, at the time, she had stopped taking her medications and believed (incorrectly) that she was pregnant and about to give birth.

In March 2014, mother settled back in Wyoming where she had secured an apartment. At that time, it appears that mother was taking her medications, but she stopped taking them in August 2014 because she believed that they were no longer effective.

In November 2014, mother became pregnant with L. Although she was not taking her medications at that time, mother obtained appropriate prenatal care during her pregnancy. Then, in July 2015, just before her due date, mother traveled to Portland intending to find a hospital that would deliver her baby. Unable to persuade a Portland doctor to

schedule her for delivery, she headed south to Corvallis. Mother presented herself at the emergency room of a hospital there while having contractions. Initially, mother was uncooperative with medical personnel, which made it difficult for them to ascertain her identity and medical history. Hospital staff eventually obtained enough information to proceed to deliver L by Cesarian section.

After mother gave birth to L, hospital staff expressed concern about mother's sudden arrival at the hospital and other behaviors. In particular, staff noted that mother was agitated and kept twisting an object in her hand, appeared to be experiencing hallucinations, and argued with doctors about L's breathing and nonexistent medical conditions. In response, mother's treating physician, Dr. Rangel, contacted the on-call psychiatrist. Mother was then transferred to the hospital's psychiatric unit for further observation and was discharged a few days later. By then, DHS had removed L from mother's care and filed a dependency petition.[2]

Following L's birth and mother's discharge from the hospital, mother engaged in outpatient mental health treatment. She saw a psychiatrist, Dr. Sobotka, and a qualified mental health counselor, Shively. Sobotka diagnosed mother with schizophrenia, unspecified type. At the jurisdictional hearing, Sobotka testified that mother had kept all of her four appointments with him and continued to take medications as prescribed. Sobotka opined that, at the time of the hearing, mother's mental illness was adequately managed. However, he testified that, if mother were to interrupt her treatment, it was likely that her symptoms would return, though he declined to indicate how long that would take. Shively similarly testified that mother kept all of her

---

[2] In the dependency petition, DHS alleged, in relevant part, that the child's conditions were such as to endanger his welfare because:

"A. The mother has recently had her parental rights involuntary terminated in Wyoming in 2014 due to mental health issues and the same issues continue to render the parent incapable of parenting this child thus constituting Aggravated Circumstances under ORS 419B.340.

"* * * * *

"C. The mother suffers from an *** emotional condition of such nature and duration to render the parent incapable of parenting for extended period[s] of time."

four 30-minute counseling appointments and appeared to be sincere in her desire to access resources for herself and her child. Indeed, at the time of the jurisdictional hearing, mother had procured an apartment and a car, was attending parenting classes, had purchased appropriate baby supplies, and had successfully participated in at least 14 supervised visits with L.

Despite mother's progress, the juvenile court asserted jurisdiction over L, concluding that "the infant child's circumstances create[d] a current threat of serious loss or injury." The court reasoned:

"Although [m]other is currently not suffering from any active symptoms of schizophrenia and her mental illness is being adequately treated right now, she has been stabilized for a very short period of time. She has a demonstrated history of interrupting her treatment and stopping taking medications. Her repeated pattern of interrupted treatment followed by several lengthy psychiatric hospitalizations pose a reasonable likelihood of harm to the welfare of the child."

The court also found that mother had no friends or family in Oregon and expressed concern that, ultimately, there was no one in mother's life to monitor her treatment and detect any symptoms, should they return.

On appeal, mother challenges the court's ultimate determination that L's circumstances posed a "current threat" of harm. According to mother, a "current threat cannot be found on the basis of speculation that conditions or circumstances persist at the time of the hearing absent evidence that such threats, in fact, persist." She argues that the facts of this case are insufficient to distinguish it from those in *M. A. H.*, where we held that the evidence did not permit a conclusion that "mother's mental health issues or her prior conduct * * * posed a *current* threat of serious loss or injury to [the child] at the time of the jurisdictional hearing." 272 Or App at 86 (emphasis in original). Mother claims that, although schizophrenia is a serious condition, the testimony presented by medical professionals at the hearing clearly indicated that she was stable and serious about getting the necessary support to parent L. Mother further argues

that, although she lost parental rights to her first child in an involuntary termination proceeding, that circumstance did not establish that L was currently endangered by her condition. She acknowledges, however, that the court could consider that factor in assessing the seriousness of a future threat to L under the totality of the circumstances.

In response, DHS contends that the court properly asserted jurisdiction over L and that the circumstances of this case are distinguishable from those at issue in *M. A. H.* First, DHS claims that mother here has a demonstrated pattern of interrupting her treatment, resulting in the need for lengthy hospitalizations, which supports an inference that "her present condition is only tentatively stable." Second, DHS argues that, unlike the mother in *M. A. H.*, mother here neither has any friends or family in Oregon to assist her nor does she appear to be motivated to establish a support system. DHS notes that mother acknowledged that she could not parent L alone and was in need of services. Lastly, DHS contends that there is a greater risk of harm to L than there was to the child in *M. A. H.* Because mother's symptoms have included delusions and hallucinations, DHS claims that L would be at risk of immediate physical danger, not just long-term emotional neglect or abuse.

In cases such as these, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *N. P.*, 257 Or App at 639. Because the parties in this case do not dispute the juvenile court's factual findings, our analysis focuses on whether that evidence provided a legally sufficient basis for the court to assert jurisdiction over L. We conclude that it did.

In *M. A. H.*, we explained:

"For a court to take jurisdiction of a child under ORS 419B.100(1)(c), the child's 'condition or circumstances' *at the time of the jurisdictional hearing* must be such as to endanger the welfare of the child or another person. A child's condition or circumstances 'endanger' the child within the meaning of the statute if they 'create a current

threat of serious loss or injury to the child,' and the threat is one that is 'reasonably likel[y]' to be realized absent juvenile court intervention."

272 Or App at 84 (emphasis in original; internal citations omitted); *see also N.P.*, 257 Or App at 639 (the specific inquiry on review is whether "the record permit[ted] the juvenile court to determine that 'the child's condition or circumstances' gave rise to a current 'threat of serious loss or injury to the child' and that there is a 'reasonable likelihood that the threat will be realized'"). In determining whether there was a reasonable likelihood of harm to a child, we consider the totality of the circumstances in each case. *Dept. of Human Services v. C.F.*, 258 Or App 50, 55, 308 P3d 344, *rev den*, 354 Or 386 (2013). Therefore, although *M.A.H.* is instructive to our analysis, its outcome does not control the outcome in this case.

Here, it is undisputed that mother's mental illness was adequately managed at the time of the jurisdictional hearing; the juvenile court expressly acknowledged as much in its findings. Thus, the question on appeal is whether the court had a legally sufficient basis to conclude that L was nevertheless at risk of serious loss or injury at the time of the hearing. *See M.A.H.*, 272 Or App at 85 (the relevant time period is the date of the jurisdictional hearing). We conclude that, under the totality of the circumstances, there was legally sufficient evidence from which the juvenile court could make that determination.

We first observe that, unlike in *M.A.H.*, mother in this case has an extensive history of severe mental illness. The record indicates that she has suffered from schizophrenia or related conditions throughout her adult life, with a demonstrated pattern of interrupted treatment and decompensation. As a result, her condition has required multiple and lengthy hospitalizations over the past seven years. Mother has suffered from delusions, hallucinations, paranoia, and disorganized thinking and behavior because of her mental illness. Additionally, her mental illness has caused her to alienate all of her family and friends, which Sobotka indicated was an associated condition of schizophrenia.

Taking into account the history, duration, and severity of mother's mental illness, it was reasonable for the court to infer that mother's mental illness was only temporarily stable at the time of the jurisdictional hearing and still posed a threat of harm to L. Mother's argument on appeal implies that the court could not reach that conclusion in light of mother's progress at the time of hearing. We disagree. Once more, we note that the juvenile court was required to consider the totality of the circumstances. *Dept. of Human Services v. S. P.*, 249 Or App 76, 84, 275 P3d 979 (2012) ("The requirements of ORS 419B.100(1)(c) are satisfied if, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." (Internal quotation marks omitted.)). Under that standard, the court had to consider the significance of mother's progress at the time of the jurisdictional hearing within the context of all the other evidence in the record. Thus, on review, our function is limited to determining whether the evidence in the record, when viewed as a whole, was legally sufficient to permit the court's ultimate determination. *Id.*

We conclude that the evidence was sufficient to support the juvenile court's conclusion that the conditions that led to L's removal from mother's care continued to present a current risk of harm to L. As noted, there was evidence that mother had an extensive history of severe mental illness and a pattern of interrupted treatment. That evidence permitted an inference that mother was likely to interrupt her treatment once more, which, according to Sobotka, would likely cause her symptoms to return. There was evidence that mother had no in-home or outside support system to monitor or provide assistance should her symptoms return, and mother did not express an interest in establishing such support. Further, although mother had not had the opportunity to parent L outside of supervised visits, his age (three months) and mother's history of a prior involuntary termination supported an inference that mother's condition would pose a threat of harm that likely would be realized without the court's intervention.

As we have previously emphasized, "our non-*de novo* appellate review function does not allow us to substitute our

assessment of the persuasiveness of the evidence for the juvenile court's, nor does it allow us to revisit the juvenile court's resolution of factual disputes or its choice among reasonable inferences." *N. P.*, 257 Or App at 640. Thus, here, where it is clear that the juvenile court considered mother's progress at the time of the jurisdictional hearing, we hold that the evidence in its totality was legally sufficient to support the court's ultimate determination.

Affirmed.